1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF WASHINGTON
9                          AT SEATTLE

10   ELICIA KNEADLER,                    CASE NO. C20-1008 MJP

11                  Plaintiff,           ORDER GRANTING
                                         DEFENDANT'S MOTION FOR
12         v.                            SUMMARY JUDGMENT

13   AUBURN SCHOOL DISTRICT,

14                  Defendant.

15

16        This matter comes before the Court on Defendant's Motion for Summary Judgment.

17   (Dkt. No. 20.) Having reviewed the Motion, Plaintiff's Opposition (Dkt. No. 27), the Reply (Dkt.

18   No. 37), and all supporting materials, the Court GRANTS Defendant's Motion.

19                                     **BACKGROUND**

20        Plaintiff Elicia Kneadler pursue claims against her former employer, the Auburn School

21   District, who she claims retaliated against her for speaking out on behalf of students receiving

22   special education at Evergreen Heights Elementary School. She brings a claim of retaliation

23

24

under Washington Law Against Discrimination and a common law claim of outrage. The District now seeks summary judgment in its favor on both claims. The Court reviews the pertinent facts.

Kneadler served as a special educator at Evergreen Heights for the 2017-2018 school year, leading the newly-created Structured Learning Center. (Compl. ¶ 3.1; Declaration of Anne Gayman ¶ 11 (Dkt. No. 21).) The Center (or SLC) was designed to provide students with moderate to severe disabilities a more inclusive learning environment that had an average of just four students. (Gayman Decl. ¶ 11.) Evergreen Heights provided other special education services through a "Resource Room" run by Venda Adams, "where students receive special education services while also attending general education classes when feasible." (Id.) The Resource Room had an average of 27 students. (Id.)

As the school year progressed, Kneadler found that one of the paraeducators helping in the Center, Laura Lee Faber, was not performing well. By at least March 21, 2018, Kneadler raised concerns to the principal of Evergreen Heights, Anne Gayman, and the Special Education Program director, Cindy Sherrod, about Faber's performance. (See Declaration of Shannon McMinimee Ex. A at 81-82 (Dkt. No. 30-1).) In an email dated March 21, 2018, Kneadler reported on her belief that Faber's performance adversely impacted her students' receipt of special education, and that removal of one of her other paraeducators, Charlotte Hubbard, would put her students at risk:

> Taking a para out, Charlotte, is doable, but we are putting students with high risk of inappropriate support of enabling [sic], inability to fade appropriately as well as unsupervised risk of injuries to staff and other students. I am concerned that regression will occur drastically.

(Id.) In another email sent a few days later to Gayman and Sherrod, Kneadler expressed her concerns about the adequacy of the staffing in the Resource Room. (Id. at 90.) She reported that

she and her paraeducators from the Center spent too much time assisting children in the Resource Room to the detriment of the students in the Center:

> I am and will continue to advocate and support for all of your students at EH, but at this point, I feel the RR room needs support from district [sic] and not me and my paras [sic] at the expense of the effect it is now having on all of us in SLC.
>
> I think we all need to take a look at SPED at EH and come up with what this pilot program is truly about. If it is to start pushing for inclusion, it is not working because I am spending less and less time pushing in with my kids due to the RR kids that are falling into my lap.

(Id.)

Kneadler also claims she complained to Gayman and Sherrod that Adams was unilaterally changing students' "individualized education program" (IEP) minutes for special education without approval. Kneadler has identified scant evidence to support this claim. First, she cites to an April 26, 2018 email that Kneadler sent to her union representative in which stated that she had made complaints to Gayman and Sherrod about changed and missed IEP minutes. (See Ex. 22 to the Declaration of Shannon Ragonesi at 1 (Dkt. No. 23-22).) Second, Kneadler cites to testimony about a meeting where she presented her concerns about Adams unilaterally changing IEP minutes. (See Deposition of Hilary Conville at 30-31 (McMinimee Decl. Ex. E. (Dkt. No. 30-5)).) But as the District correctly points out, Kneadler made this complaint months after she had submitted her resignation. (Conville Dep. at 40 (Supp. Ragonesi Decl. Ex. 4 (Dkt. No. 38-4)).)

Kneadler claims that after reported her concerns to Gayman and Sherrod she unfairly received a negative performance evaluation from Gayman in late April 2018 that recommended non-renewal of her contract. This, she claims, was an act of retaliation. In support of this assertion, Kneadler points out that before making her reports, Kneadler had received positive performance reviews from Gayman during fall and winter observation sessions, and as part of

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 3

1  her mid-year review. (See McMinimee Decl. Ex. A at 14-18 22-24, 27-44, 69-80; McMinimee
2  Decl. Ex. B at 27-64; Gayman Decl. Exs. A & B.) Kneadler suggests that the basis for Gayman's
3  negative evaluation was inadequate to justify the recommended non-renewal. The Court reviews
4  the facts relative to this negative review.

5  Gayman based her recommendation not to renew Kneadler's contract on reports to her
6  from staff that Kneadler had engaged in "negative talk" about Faber and others at Evergreen
7  Heights. (Gayman Decl. Ex. 6 at 1 (Dkt. No. 21-6); Gayman Decl. ¶¶ 12-13; Gayman Dep.. at
8  47, 77-80 (Dkt. No. 30-1).) Gayman also based her recommendation on a call from a parent who
9  reported that Kneadler talked negatively about Faber to the parent. (Gayman Dep. 77-80, 88-90.)
10 Gayman did not independently investigate the claims of "negative talk." (Id.) But she held a
11 "counseling" meeting with Kneader on April 18, 2018 to discuss "negative talk in [her]
12 classroom regarding staff members" and Kneadler reportedly "said she had been doing it and
13 would not do it anymore, and that was the extent of it." (Gayman Decl. Ex. 3 at 1.) Kneadler's
14 acceptance of responsibility for her negativity is also confirmed in an April 26, 2018 email she
15 sent to her union representative. (Ragonesi Decl. Ex. 22 at 1.) Kneadler received no discipline
16 immediately after the "counseling" meeting on April 18, 2021. (Gayman Dep. at 74.) But at least
17 the day before the "counseling" meeting Gayman had recommended Kneadler's contract not be
18 renewed because of the "negative talk." (Gayman Decl. Ex. 4 (April 17, 2018 email); Gayman
19 Dep. 76-77, 81, 87; Gayman Decl. Ex. 6 at 1 (Dkt. No. 21-6 at 1).) But Gayman's
20 recommendation was not made known to Kneadler at that time.

21 On April 24, 2018, Gayman then conducted an in-person evaluation of Kneadler in the
22 classroom. (Gayman Dep. at 64, 75.) Gayman's evaluation included several below grade ratings
23 ("Basic" or "Unsatisfactory") for both "professional collaboration" and "ethics and advocacy,"
24

among other areas. (Gayman Decl. Ex. 5.) These grades were based on the following comment: "As mentioned at our meeting last week, talking negative [sic] about other staff members to paras or other staff members is not appropriate and negatively impacts the building climate." (Gayman Decl. Ex. 5 at 6.) Gayman testified that these grades were "related to the conversation [she] had with [Kneadler] about negative talk." (Gayman Dep. at 73; 88-90.) The evaluation recommended non-renewal of Kneadler's contract and was "locked" the same day that the observation was conducted, meaning that Kneadler was unable to add comments into the report. (See Gayman Dep. at 73.)

Kneadler learned about her negative performance evaluation by at least April 26, 2018. (See Ragonesi Decl. Ex. 22 (Dkt. No. 23-22.) On April 27, 2018, she formally received the evaluation and that same day she submitted her resignation effective at the end of the school year. (Ragonesi Decl. Ex. 24.) Kneadler appears to have done so on her union's advice to avoid having the non-renewal on her record, which would have made future employment in the public schools difficult. (Ragonesi Decl. Ex. 23 at 3.) As a result of Kneadler's decision, Gayman did not take any steps to make her recommendation of non-renewal to the District's Superintendent. (Gayman Decl. ¶ 15.) And as the District points out, Kneadler could have appealed the negative evaluation had she not resigned. (See Declaration of Daman Hunter ¶¶ 3-5 (Dkt. No. 22).) Kneadler worked to the end of the 2017-2018 school year.

## ANALYSIS

A.   **Legal Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether

an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. Id. at 248. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. Anderson, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323-24.

**B.      Exhaustion**

The District initially sought dismissal on the theory that Kneadler had failed to exhaust her claims. But after reviewing Kneadler's opposition, the District has withdrawn that argument and the Court does not consider it.

**C.      Retaliation**

The WLAD prohibits discrimination in employment on the basis of sex, race, sexual orientation, and other protected characteristics. RCW 49.60.030. The WLAD also prohibits employers from retaliating against employees who oppose discriminatory practices. RCW 49.60.210(1). To help enforce this prohibition, the legislature has directed the courts to liberally construe the provisions of WLAD. See RCW 49.60.020. "To establish a prima facie case of retaliation, an employee must show three things: (1) the employee took a statutorily protected action, (2) the employee suffered an adverse employment action, and (3) a causal link between

the employee's protected activity and the adverse employment action." Cornwell v. Microsoft Corp., 192 Wn.2d 403, 411 (2018).

In evaluating a claim of retaliation, the Court uses the three-step McDonnell Douglas burden-shifting analysis. See Cornwell, 192 Wn.2d at 411. At the first step, the plaintiff must satisfy the prima facie elements of her claim, though she may do so using "circumstantial, indirect, and inferential evidence." See Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cty., 189 Wn.2d 516, 526 (2017). If the plaintiff satisfies the prima facie elements of the claim, then there is a rebuttable presumption of retaliation. Id. at 527. At the second step, "the burden shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for the adverse employment action." Id. (citation and quotation omitted). If the defendant satisfies its burden, then at the third step "the plaintiff must produce sufficient evidence showing that the defendant's alleged nondiscriminatory reason for the adverse employment action was a pretext." Id.

**1.      Plaintiff's prima facie case**

Although Kneadler has demonstrated that she engaged in protected activity, she fails to identify an actionable adverse employment action. Construing the evidence in Kneadler's favor, she has not satisfied her burden as to her prima facie claim. The Court therefore GRANTS the Motion as to this claim, as explained below.

**a.      Statutorily protected activity**

An "employee engages in WLAD-protected activity when he opposes … practices forbidden by antidiscrimination law or other practices that he reasonably believed to be discriminatory." Alonso v. Qwest Communications Co., LLC, 178 Wn. App. 734, 754 (2013). As the District concedes, Kneadler can make this showing by pointing to evidence she "advocate[d] on behalf of her disabled students or protest[ed] discrimination perpetrated on them by others." (Reply at 8 (citing Ray v. Henderson, 217 F.3d 1234, 1240 n. 3 (9th Cir. 2000)).) But

1  contrary to the District's assertion, the complaint need not be through any formal channel:
2  "Making an informal complaint to a supervisor is also a protected activity." <u>Ray</u>, 217 F.3d at
3  1240 n.3. And "an employee's complaints about the treatment of others is considered a protected
4  activity, even if the employee is not a member of the class that he claims suffered from
5  discrimination, and even if the discrimination he complained about was not legally cognizable."
6  <u>Id.</u>

7        Kneadler has shown sufficient evidence that she opposed what she believed to be the
8  District's failure to provide full special education to her disabled students who are part of a
9  protected class. The evidence shows that Kneadler sent at least two emails in March 2018
10 identifying a risk of harm or inadequate provision of special education to her students. (<u>See</u>
11 McMinimee Decl. Ex. A at 81-82, 90.) When questioned under oath, Sherrod recalled receiving
12 these complaints about staffing levels that might have impacted Kneadler's ability to provide
13 special education to her students. (Deposition of Cindy Sherrod at 51-56 (McMinimee Decl. Ex.
14 D (Dkt. No. 30-4)).) Construing this evidence in Kneadler's favor, the Court finds it suffices to
15 show Kneadler engaged in protected activity. She was advocating on behalf of her students to
16 raise her concerns that they might not safely receive all special education due to them as a result
17 of certain staffing decisions.

18       Kneadler has also identified a dispute of fact as to whether she engaged in protected
19 activity when reporting her belief that Adams was failing to provide all IEP minutes due to
20 Adams' students. The District is correct that at least one complaint Kneadler identifies occurred
21 after Kneadler tendered her resignation. (<u>See</u> Conville Dep. at 40.) But Kneadler also appears to
22 have engaged in this advocacy before receiving her notice of non-renewal and negative
23 evaluation. (<u>See</u> Ragonesi Decl. Ex. 22 at 1.) While Kneadler has not provided a declaration of
24

her own or identified any other information about this topic, the Court finds this sufficient to raise a genuine issue of fact as to whether she engaged in this further protected activity.

### b. Adverse employment action

Kneadler argues that she suffered at least two adverse employment actions: (1) receiving a negative and unwarranted performance review; and (2) being constructively discharged. But Kneadler fails to provide evidence sufficient to show that either constitutes an adverse employment action.

"An adverse employment action involves a change in employment that is more than an inconvenience or alteration of one's job responsibilities." Boyd v. Dep't of Soc. & Health Servs., 187 Wn. App. 1, 13 (2015) (citing Alonso, 178 Wn. App. at 746). In general, an adverse employment action "means 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Marin v. King Cty., 194 Wn. App. 795, 808 (2016) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). "Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion." Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000). "The employee must show that a reasonable employee would have found the challenged action materially adverse, meaning that it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Boyd, 187 Wn. App. at 13 (quoting Burlington Northern. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

First, Kneadler has failed to demonstrate that her negative performance evaluation itself was an adverse employment action. Kneadler argues that because the evaluation was final and "locked" it amounts to an adverse employment action. (Pl. Opp. at 13 (citing Brooks, 229 F.3d

917).) But the law requires Kneadler to show that the negative performance evaluation was both "undeserved" and not subject to revision even through an appeals process. See Brooks, 229 F.3d at 929-30. Here, the evaluation was subject to potential modification on appeal, which could have resulted in a "revision or removal of the negative ratings in the performance evaluation if warranted." (Hunter Decl. ¶¶ 3-5.) Because the evaluation was appealable, it cannot serve as an adverse employment action. See Brooks, 229 F.3d at 929-30.

Second, Kneadler has not marshalled sufficient evidence to demonstrate that she was constructively discharged.

Under Washington law, "an involuntary or coerced resignation is equivalent to a discharge." Micone v. Steilacoom Civil Serv. Com, 44 Wn. App. 636, 639 (1986). "To establish constructive discharge, an employee must show (1) a deliberate act by the employer that made her working conditions so intolerable that a reasonable person in her shoes would have felt compelled to resign, and (2) that she resigned because of her working conditions and not for some other reason." Short v. Battle Ground Sch. Dist., 169 Wn. App. 188, 206 (2012), disapproved of on different grounds by Kumar v. Gate Gourmet Inc., 180 Wn.2d 481 (2014) (citing Nielson v. AgriNorthwest, 95 Wn. App. 571, 578 (1999)). "Whether working conditions have risen to an intolerable level is generally a factual question for the jury, unless there is no competent evidence to establish a claim of constructive discharge." Id. at 207 (citation omitted). "[C]ourts usually look for evidence of either 'aggravating circumstances' or a 'continuous pattern of discriminatory treatment' to support a constructive discharge claim." Sneed v. Barna, 80 Wn. App. 843, 850 (1996) (quotation omitted). And a "resignation is not rendered involuntary simply because [the plaintiff] submitted it to avoid termination for cause, nor is it relevant that he subjectively believed he had no choice but to resign." Molsness v. City of Walla Walla, 84 Wn.

App. 393, 399 (1996). Instead the plaintiff must show that her decision was not objectively voluntary for reasons such as "an employer's oppressive actions" and that no "good cause" existed to substantiate the threatened termination. Nielson, 95 Wn. App. at 577.

Kneadler fails to identify any facts to support a finding that her working conditions were intolerable. Kneadler's opposition brief states that she faced "overly harsh conditions" but cites to no evidence in the record to support this assertion. (Opp. at 14.) Kneadler herself did not file a declaration to identify any specific facts supporting the claim. And the Court has not otherwise been able to identify any facts in the parties' submissions that might show Kneadler faced intolerable working conditions. While the District may have taken away her preferred paraeducator, this does not show the work conditions were objectively intolerable. Indeed, Kneadler stayed on in the role through the end of the year. The absence of any facts to demonstrate the intolerable nature of the working conditions is fatal to Kneadler's claim. See Short, 169 Wn. App. at 207-08. Kneadler also fails to cite to any evidence that Gayman's recommendation of non-renewal was unsubstantiated. Kneadler admitted to engaging in negative talk, which undermines her present claim that the criticism was unmerited or that Gayman inadequately investigated the issue. (Compl. ¶ 3.19; Ragonesi Decl. Ex. 23 at 1.). Kneadler instead argues that her "negative talk" could not have served as grounds for non-renewal because she had already been counseled on it and it is "improper to both discipline and negatively review an employee for the exact same conduct." (Opp. at 3 (Dkt. No. 27 at 3).) But Kneadler cites to no policy or rule to support this assertion—just testimony from Sherrod that she was "not aware of any – of any situation that would marry the [process for addressing employee misconduct and the process for evaluating employee performance] together." (Ex. C to McMinimee Decl. at 20 (Dkt.

No. 30-3 at 20).) The Court is unpersuaded by Kneadler's assertion and finds that she has not shown that Gayman's recommendation was unsubstantiated.

Having considered the record in the light most favorable to Kneadler, the Court concludes that Kneadler has failed to identify an actionable adverse employment action.

### c.     Causation

Because Kneadler does not identify an adverse employment action, she necessarily fails to demonstrate causation between protected conduct and an adverse employment action.

### 2.     Remaining McDonnell Douglas analysis

Given Kneadler's failure to sustain a prima facie case of retaliation, the Court does not engage in the second and third steps of the McDonnell Douglass analysis, and GRANTS the District's Motion as to this claim.

### D.     Outrage

"To prevail on a claim for outrage, a plaintiff must prove three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) severe emotional distress on the part of the plaintiff." Robel v. Roundup Corp., 148 Wn.2d 35, 51 (2002) (citation and quotation omitted). The first element requires proof that the conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Dicomes v. State, 113 Wn.2d 612, 630 (1989) (citation and quotation omitted). "Although the three elements are fact questions for the jury, this first element of the test goes to the jury only after the court 'determine[s] if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability.'" Robel, 148 Wn.2d at 51 (quoting Dicomes, 113 Wn.2d at 630).

1  Kneadler argues that "[d]isciplining and seeking to terminate an otherwise high
2  performing special education teacher for potentially engaging in negative talk at one meeting is
3  conduct that cannot be reconciled with public employment." (Opp. at 16.) The Court finds that
4  the conduct Kneadler identifies falls far short of the kind necessary to support a claim of outrage.
5  Kneadler admitted to engaging in the negative talk and fails to convince the Court that such
6  conduct cannot serve as grounds for her termination. The Court does not believe that reasonable
7  minds could differ from the Court's conclusion that the District's conduct here was insufficiently
8  extreme and outrageous as to be outside the bounds of decency or intolerable to a civilized
9  community. The Court therefore GRANTS the District's Motion as to this claim.

**E.  Motion to Strike**

The District correctly asks the Court to strike the expert report of Bonnie McGuire as untimely. The Court set the expert deadline for May 28, 2021. (Dkt. No. 16.) But Kneadler waited until July 7, 2021 to provide the expert report of Bonnie McGuire, itself dated June 13, 2021. The Court finds Kneadler's failure to timely disclose McGuire's report unjustified. The Court therefore STRIKES the report as untimely under Fed. R. Civ. P. 37(c) and it has not considered the report in deciding the District's Motion for Summary Judgment.

**CONCLUSION**

The District has tested Kneadler's proof as to both her retaliation and outrage claims. Kneadler has failed to show material facts in dispute on critical elements necessary to sustain either one. Kneadler has not identified an adverse employment action necessary to support her prima facie claim of retaliation. And Kneadler has not provided sufficient evidence to sustain a claim of outrage. The Court thus GRANTS the District's Motion and finds that the District is

1  entitled to summary judgment in its favor on all of Kneadler's claims. The Court also GRANTS

2  the District's request to strike the report of Bonnie McGuire.

3      The clerk is ordered to provide copies of this order to all counsel.

4      Dated October 8, 2021.

*[signature]*

Marsha J. Pechman
United States Senior District Judge